Laurence M. Rosen, Esq. (SBN 219683)
**THE ROSEN LAW FIRM, P.A.**
355 South Grand Avenue, Suite 2450
Los Angeles, CA 90071
Telephone: (213) 785-2610
Facsimile: (213) 226-4684
Email: lrosen@rosenlegal.com

Yu Shi, Esq. (*Pro Hac Vice*)
**THE ROSEN LAW FIRM, P.A.**
275 Madison Ave, 34th Floor
New York, NY 10016
Telephone: (212) 686-1060
Facsimile: (212) 202-3827
Email: yshi@rosenlegal.com

Counsel for Lead Plaintiffs

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| FELIPE GARCIA, Individually and on behalf of all others similarly situated,<br><br>    Plaintiffs,<br><br>    v.<br><br>HETONG GUO, JING YANG, JIANGYU LUO, and LENTUO INTERNATIONAL INC.,<br><br>    Defendants. | Case No: 2:15-CV-01862-MWF-MRW<br><br>CLASS ACTION<br><br>**PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANT LENTUO INTERNATIONAL INC.'S MOTION TO DISMISS AMENDED CLASS ACTION COMPLAINT**<br><br>Judge: Hon. Michael W. Fitzgerald<br>Courtroom: 1600<br>Hearing Date: December 14, 2015<br>Hearing Time: 10:00 a.m. |

# **Table of Contents**

INTRODUCTION ......................................................................................... 1

STATEMENT OF FACTS ............................................................................. 2

   A.   Lentuo International Inc. and its Corporate Structure ....................... 2

   B.   The Exclusive Call Option Agreements ........................................... 3

   C.   Defendant Hetong Guo ..................................................................... 3

   D.   Lentuo Secretly Takes Out Massive Loans Through LE .................. 4

   E.   Lentuo's Cash Problems Turn Dire ................................................. 6

   F.   Subsequent Events After the Class Period ....................................... 6

ARGUMENT ................................................................................................. 7

   A.   Applicable Legal Standards ............................................................. 7

   B.   Plaintiffs Adequately Pled Falsity .................................................. 8

      1.   Plaintiffs Have Independently Verified the Existence of the Two Trusts ..... 8

      2.   Lentuo's SEC Filings Were Misleading for Failure to Disclose the RMB 250 Million Trust Loans ..................................................... 11

      3.   Lentuo Had an Independent Duty to Disclose the Two Trusts Because of the Call Option Agreement Violation and Guo's Personal Guarantee ........ 12

      4.   Lentuo was Required to Disclose the RMB 250 Million Trust Loans as Related Party Transactions ........................................ 15

      5.   Lentuo Improperly Concealed Its Cash Flow Problems ............................. 16

   C.   Plaintiffs Adequately Pled Scienter ................................................. 19

   D.   Plaintiffs Adequately Pled Loss Causation ...................................... 21

CONCLUSION ............................................................................................ 25

Plaintiffs' MPA in Opposition to Defendant's Motion to Dismiss

1

## Table of Authorities

2 **Cases**

3 *Altvater Gessler–J.A. Baczewski Int'l (USA) Inc. v. Sobieski Destylarnia S.A.*
    572 F.3d 86 (2d Cir.2009) ........................................................................ 18

4

5 *Ashcroft v. Iqbal*,
    129 S.Ct. 1937 (2009)................................................................................ 7

6

7 *Bell Atlantic Corp. v. Twombly*,
    550 U.S. 544 (2007)................................................................... 7, 10, 19

8

9 *Carlson v. Xerox Corp.*
    392 F.Supp.2d 267 (D. Conn. 2005)...................................................... 21

10

11 *China Educ. Alliance Inc., Sec. Litig.*,
    2011 WL 4978483 (C.D. Cal. Oct. 11, 2011) ......................................... 7

12

13 *Craftmatic Sec. Litig.* v. *Kraftsow*
    890 F.2d 628 (3d Cir. 1990) ................................................................... 15

14

15 *Dean v. China Agritech, Inc.*,
    2011 WL 5148598 (C.D.Cal. Oct.27, 2011) ........................................... 9

16 *Deer Consumer Products, Inc. v. Alfred Little*
    Index No. 650823/2011 (N.Y. Sup. Ct. 2011)........................................ 10

17

18 *Dura Pharms., Inc. v. Broudo*,
    544 U.S. 336 (2005)................................................................................. 7

19

20 *Emergent Capital Inv. Mgmt., LLC. v. Stonepath Group, Inc.*
    343 F.3d 189 (2d Cir.2003) .................................................................... 21

21

22 *Henning v. Orient Paper, Inc.*
    2011 WL 2909322 (C.D.Cal. July 20, 2011)...................................... 9, 10

23

24 *In re Air Disaster at Lockerbie, Scotland, on Dec. 21, 1988*
    144 F.R.D. 613 (E.D.N.Y. 1992)........................................................... 18

25

26 *In re Cabletron Systems, Inc.*,
    311 F.3d 11 (1st Cir. 2002)................................................................ 9, 18

27 *In re China Education Alliance, Inc.*,
    2011 WL 4978483 (C.D.Cal. Oct.11, 2011) ..................................... 9, 10

28

Plaintiffs' MPA in Opposition to Defendant's Motion to Dismiss

*In re Daou Systems, Inc. Sec. Litig.*
  411 F.3d 1006 (9th Cir. 2004) ...................................................................22

*In re Employees Solutions Sec. Litig.*
  1998 WL 1031506 (D. Ariz., Sept. 22, 1998) .........................................18

*In re Gilead Scis. Sec. Litig.*
  536 F.3d 1049 (9th Cir. 2008) ...............................................7, 8, 21, 24

*In re LDK Solar Sees. Litig.,*
  584 F.Supp.2d 1230 (N.D.Cal.2008) .......................................................10

*In re Turbodyne Technologies, Inc., Sec. Litig.*
  2000 WL 33961193 (C.D. Cal. Mar. 15, 2000).......................................20

*McCabe v. Ernst & Young, LLP*
  494 F.3d 418 (3rd Cir.2007) ....................................................................21

*Metzler Inv. GMBH v. Corintian Colls., Inc.*
  540 F.3d 1049 (9th Cir. 2008) .................................................................23

*Middlesex Retirement System v. Quest Software, Inc.,*
  2008 WL 7084629 (C.D. Cal. 2008) .........................................................8

*Nordstrom, Inc. v. Chubb & Son, Inc.*
  54 F.3d 1424 (9th Cir. 1995) ...................................................................19

*Nuveen Municipal High Income Opportunity Fund v. City of Almeda*
  730 F.3d 1111 (9th Cir. 2013) .................................................................23

*Oregon Public Employees Retirement Fund v. Apollo Group, Inc.*
  774 F.3d 598 (9th Cir. 2014) ...................................................................23

*Redwen v. Sino Clean Energy, Inc.,*
  2012 WL 1991762 (C.D. Cal. June 4, 2012).............................................9

*Rehm v. Eagle Financial Corp.*
  954 F.Supp. 1246 (N.D.Ill.1997)..............................................................20

*S.E.C. v. Musella*
  748 F.Supp. 1028 (S.D.N.Y.1989) ...........................................................21

Plaintiffs' MPA in Opposition to Defendant's Motion to Dismiss

*Scott v. ZST Digital Networks, Inc.*,
  2012 WL 538279 (C.D.Cal. Feb.14, 2012) ............................................................. 9

*Sino-Clean Energy, Inc. v. Alfred Little*
  Index No. 651248/2011 (N.Y. Sup. Ct.) ............................................................... 10

*Skypeople Fruit Juice Inc. v. Absaroka Capital Management LLC*
  11-CV-239-NDF (D. Wy.) ................................................................................... 10

*South Ferry LP, No. 2 v. Killinger*,
  542 F.3d 776 (9th Cir. 2008) ................................................................................. 8

*Starr v. Baca*,
  652 F.3d 1202 (9th Cir. 2011) ............................................................................. 18

*Steckman v. Hart Brewing, Inc.*,
  143 F.3d 1293 (9th Cir. 1999) ............................................................................. 15

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
  127 S.Ct. 2499 (2007) ..................................................................................... 8, 19

*U.S. v. Minkow*
  11-cr-20209-PAS (S.D. Fla.) ................................................................................ 10

*United States v. DiStefano*
  555 F.2d 1094 (2d Cir.1977) ................................................................................ 21

*United States v. Johnson*
  513 F.2d 819 (2d Cir.1975) .................................................................................. 21

*Yanek v. Staar Surgical Co.*,
  388 F.Supp.2d 1110 (C.D. Cal. 2005) ................................................................. 17

*Zucco Partners, LLC v. Digimarc Corp.*,
  552 F.3d 981 (9th Cir. 2009). ......................................................................... 8, 9, 18

**Statutes**

15 U.S.C. § 77z–2(c)(1) ......................................................................................... 17

15 U.S.C. § 78u-4(b)(1) ........................................................................................... 8

15 U.S.C. §§ 78u-4(b)(1)(B) .................................................................................... 8

15 U.S.C. §§ 78u-4(b)(2)(A) .................................................................................... 8

iv

Plaintiffs' MPA in Opposition to Defendant's Motion to Dismiss

1  **Other Authorities**

2  SEC Adopting Release 53197,

3     Federal Register, Vol. 71, No. 174, September 2006, Rules and Regulations........15

4  Victor Brudney, *A Note on Materiality and Soft Information Under the Federal*

5     *Securities Laws*,

6     75 Va. L. Rev. 723, (1989) .......................................................................15

7  **Rules**

8  17 C.F.R. § 299.403(b) .................................................................................14

9  Fed. R. Civ. P. 12(b)(6) .................................................................................7

10  Fed. R. Civ. P. 9(b) .......................................................................................8

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Plaintiffs' MPA in Opposition to Defendant's Motion to Dismiss

1    Lead Plaintiffs Bradley Van Dalen, Steven Bohm, and Wei Zhang
2    ("Plaintiffs") respectfully submit this Memorandum of Points and Authorities in
3    opposition to defendant Lentuo International Inc.'s ("Lentuo" or the "Company")
4    Motion to Dismiss the Amended Class Action Complaint ("Complaint").

## INTRODUCTION

6    Plaintiffs' Complaint presents a simple story.  In a slumping but ultra-
7    competitive Chinese auto dealership industry, Lentuo's business was deteriorating
8    and the company was hemorrhaging cash.  In order to continue funding its operations,
9    Lentuo covertly issued RMB 250 million worth of debt in the form of trust loans.
10   Yet, the loans failed to revive Lentuo, and its business continued to decline and its
11   cash shortage continued to worsen.  Until, at last, banks seized the keys to Lentuo's
12   show cars, forcing Lentuo to essentially shut down.

13   Lentuo disclosed none of this.  It concealed its borrowing of RMB 250 million
14   in China to maintain a façade of financial health and keep its share value high in the
15   U.S., because it had aspirations of conducting another round of securities offerings in
16   America.  Therefore, it needed to conceal its cash shortage from American investors.
17   Cunningly, Lentuo and its chairman Hetong Guo devised a brilliant plan: it would
18   secretly raise the money in China, and would take advantage of Lentuo's complex
19   Variable Interest Entity ("VIE") structure to hide the loans from U.S. investors by
20   borrowing the money through the parent company of its Chinese operating entities.
21   That is easy to do when chairman Guo controlled Lentuo, its subsidiaries, that
22   closely-related parent entity, and all of Lentuo's operating entities.  The problem for
23   Lentuo's  shareholders, however, is that these loans were in reality incurred by and
24   for the benefit of Lentuo, and not only would revenue from Lentuo's operating
25   entities be used to repay the loans, but Guo's entire 46% ownership interest in Lentuo
26   was pledged as security.  Of course, none of this was disclosed to shareholders, until
27   a research company discovered the RMB 250 million trust loans and finally spread
28   the news.

1

The clandestine capital injection did not cure Lentuo's cash shortage. In early 2015, Lentuo shareholders were hit with another shocking revelation that showed just how bad the situation was at Lentuo: that many of Lentuo's car dealerships in Beijing have essentially shut down and keys for show cars have been confiscated by banks for non-payment of debt. Of course, Lentuo had never disclosed any of this to shareholders, or even suggested that it was having serious cash problems. Shortly thereafter, Lentuo was delisted by the New York Stock Exchange ("NYSE"). Lentuo shares are now worthless.

Lentuo now asks the Court to deny Plaintiffs redress and dismiss the Complaint. As detailed below, Plaintiffs have met their pleading burdens and the Court should deny Lentuo's motion to dismiss in its entirety.

## STATEMENT OF FACTS

### A. Lentuo International Inc. and its Corporate Structure

Lentuo is Cayman Islands corporation headquartered in Beijing, the People's Republic of China (the "PRC"). ¶ 21.[1] Lentuo operates automobile franchise dealerships commonly known in China as "4S" shops ("sales, spare parts, services, and survey"), reflecting the Company's aim to provide a "one-stop shop" experience for its customers. *Id.* Until its stock was halted and eventually delisted by the New York Stock Exchange ("NYSE") in early 2015, Lentuo traded on the NYSE under the ticker "LAS." *Id.*

As strictly a holding company, Lentuo does not conduct any substantial business operations on its own; instead, Lentuo's business is carried out by its variable interest entities ("VIEs") located in the PRC. ¶ 28. Lentuo employs the VIE structure because PRC law imposes certain limitations on direct equity ownership by foreigners of PRC companies operating in certain strategic industries. ¶ 36. Via the VIE structure, Lentuo avoids running afoul of PRC law because it exercises control

---

[1] All citations to "¶" refer to the Amended Class Action Complaint for Violation of the Federal Securities Laws ("Complaint") (Dkt. #25).

over – and assumes the economic benefits and losses of – the VIEs through contractual arrangements rather than direct equity ownership. ¶ 37. In short, Lentuo shareholders don't actually own any operating assets.  They simply own a series of contracts that give them a right to all of the economic benefits and losses of, and to exercise control over, the nine PRC auto dealership operating entities.

The relevant features of Lentuo's VIE structure are as follows: Lentuo owns 100% of Lentuo HK Limited ("Lentuo HK"). ¶ 29. Lentuo HK, in turn, owns 100% of Beijing Anhui Wanxing Science & Technology Co., Ltd. ("Lentuo Beijing"). ¶ 30. Lentuo HK and Lentuo Beijing entered into a series of contractual arrangements with Beijing Lentuo Electromechanical Group Co., Ltd. ("LE") that allowed Lentuo, through Lentuo HK and Lentuo Beijing, to take effective control over nine of LE's subsidiaries.  ¶ 31. The nine LE subsidiaries, then, became VIEs of Lentuo and are the entities through which Lentuo conducts its business operations.  *Id.*  A diagram showing Lentuo's corporate structure, as taken from Lentuo's 2013 20-F, is attached to this brief as Attachment 1.

**B. The Exclusive Call Option Agreements**

Among the series of contracts underpinning Lentuo's VIE arrangement, an important one is the Exclusive Call Option Agreement ("Call Option Agreement"). The Call Option Agreement is entered into between and among Lentuo HK, LE, and each of the VIEs.  ¶ 31.  Critically, pursuant to the Call Option Agreement, the VIEs may not "sell, transfer, mortgage or dispose of any asset, business or ***beneficial right***…or allow creation of any other Security Interest" without the written consent of Lentuo HK. Complaint, Exhibit A at Article. 2.1.3. (emphasis added).

**C. Defendant Hetong Guo**

Defendant Guo is Lentuo's founder, chairman, and largest shareholder (46% as of May 15, 2014).  ¶ 44.  Attesting to Guo's importance to the Company, Lentuo's Form 20-F annual report for the year 2013 ("2013 20-F") proclaimed that "our

success depends to a significant degree upon the continued contributions of our management team, including Mr. Hetong Guo and Mr. Jing Yang." ¶ 48.

Guo also controls LE, the parent company of Lentuo's VIEs. ¶ 45. He owns 75% of LE, and serves as the Legal Representative for LE and its subsidiaries. *Id.* This is important because the Legal Representative of a PRC company has the power to enter into any type of contract on behalf of the company. *Id.*

Additionally, Guo is the sole director and Authorized Representative of Lentuo HK, and the Legal Representative of Lentuo Beijing. ¶¶ 46-47. This means that Guo, as the Authorized Representative of Lentuo HK and the Legal Representative of LE and its subsidiaries (i.e. Lentuo's VIEs), signed the Call Option Agreement on behalf of all parties. ¶ 35; *see also* Exhibit A to Complaint at page 10.

**D. Lentuo Secretly Takes Out Massive Loans Through LE**

On May 28, 2014, *SeekingAlpha.com* ("Seeking Alpha") published a report by GeoInvesting LLC, a research company, revealing that Lentuo had secretly issued RMB 250 million of debt via two investment trusts to investors in China (together, the "RMB 250 Million Trust Loans"). ¶ 62.

The RMB 250 Million Trust Loans, comprised of a RMB 150 million loan and a RMB 100 million loan, were both fully subscribed by December 2013, five months before Lentuo filed its 2013 Form 20-F with the SEC. ¶¶ 49, 62. Chinese private investors invested RMB 250 million into the two trusts which then issued the two loans to LE. While the debt was ostensibly issued by LE, the real primary beneficiary and obligor was in fact Lentuo, while Hetong Guo guaranteed the debt with his 46% interest in Lentuo and his 75% interest in its operating entities. ¶ 62.

A due diligence summary for the RMB 150 million loan revealed the following critical feature of the trust:

- "Revenue generated from all 4S stores (including 4S stores under construction) of Beijing Lentuo Electromechanical Group Co., Ltd." was

4

listed as the sole source of "money payback". ¶ 62. This is significant because all nine of LE's 4S stores are VIEs of Lentuo. ¶ 31.

- Hetong Guo and his wife were listed as guarantors and agreed to provide "unlimited joint and several liability." ¶ 62.

- The funds would be used for the construction of an Audi 4S store in Beijing for LE.  ¶ 62. On its 2013 20-F, Lentuo disclosed that it was building an Audi dealership in Beijing. ¶ 70.

Meanwhile, the due diligence summary for the RMB 100 million loan revealed the following:

- Hetong Guo and his wife provided an unlimited guarantee of repayment of the trust loans jointly and severally. ¶ 62.

- Under a section entitled "Risk Control", it is noted that Guo owned 14,965,646 shares in Lentuo as of January 22, 2013, and that on December 10, 2010, "Lentuo International of Lentuo Group" went public on the NYSE, thus reassuring trust investors of the reliability of the "first source of money payback." ¶ 62.

Lentuo issued a response the next morning (the "Lentuo Response"), on May 29, 2014, admitting the existence of the RMB 150 million loan, but denying that it imposed any obligations or liabilities on Lentuo. ¶ 62.  Lentuo's response did not address the RMB 100 million loan.  *Id.*

In response to the Lentuo Response, Seeking Alpha published a rebuttal from GeoInvesting on June 5, 2014 (the "GeoInvesting Rebuttal"). ¶ 64.  The GeoInvesting Rebuttal further clarified Lentuo and Guo's obligations under the two trust loans, and debunked Lentuo's claim that Lentuo's 4S shops would not incur any obligations, while also refuting Lentuo's contention that Guo did not pledge any of his equity interest in Lentuo as part of his guarantee for the trust loans.[2] ¶ 64.

---

[2] In the Facts section of Lentuo's brief, Lentuo states that it issued another response to the GeoInvesting Rebuttal, which again denied GeoInvesting's allegations.

Following the June 5, 2014 GeoInvesting Rebuttal, Lentuo's ADS fell $0.34 per share, or over 9% from its previous closing price, to close at $3.15 per share. ¶ 79.

**E. Lentuo's Cash Problems Turn Dire**

On March 10, 2015, an article appeared in the Beijing Business Today ("BBT Article"), reporting that Lentuo's VIEs in Beijing have effectively shut down due to financial difficulties. ¶ 73.

Specifically, the BBT Article reported that Lentuo's 4S shops were in "a state of semi-closure," as keys to the show cars in several of Lentuo's 4S shops had been confiscated by banks due to Lentuo's cash problems. ¶ 74. The BBT Article further reported that "due to cash flow problems, the 4S shops of Lentuo stopped selling new cars, and only post-sale services are provided." ¶ 75.

According to the BBT Article, Lentuo's cash problems were not new; in fact, a responsible party in charge of Lentuo's Mazda 4S shop told BBT that Lentuo had been having cash problems "starting the end of last year." ¶ 75. Furthermore, the industry as a whole had been "facing [an] unprecedented death trail" over the past two years, and that like Lentuo, more and more 4S dealers were facing cash problems. ¶ 77.

As a result of the adverse information in the BBT Article, all of which Lentuo had concealed from investors, Lentuo's ADS fell $0.30 per share, or more than 50% over the next two days, to close at $0.29 per share on March 11, 2015. ¶ 80.

**F. Subsequent Events After the Class Period**

On April 2, 2015, the NYSE halted trading in Lentuo's securities because Lentuo had been "unresponsive to repeated NYSE Regulation attempts at contact and

---

Because defendants may not introduce new facts on a motion to dismiss, and because Lentuo did not (and indeed cannot) seek judicial notice of its June 6, 2014 response, the Court may not accept Lentuo's June 6, 2014 response for the truth of the matter asserted therein. *Forsberg v. Ocwen Loan Servicing LLC,* 2014 WL 3563298, at *2 (W.D. Wash. July 18, 2014) ("The Court notes that, on a motion to dismiss, the Court will not consider new facts alleged in motion papers.").

requests for information in February and March 2015." ¶ 82. Subsequently on April 13, 2015, the NYSE commenced proceedings to immediately delist Lentuo. ¶ 83.

## **ARGUMENT**

To state a claim under Section 10(b) of the Securities Exchange Act and the accompanying regulation Rule 10b-5, Plaintiffs must allege the following elements: (1) a material misrepresentation or omission, (2) scienter, (3) a connection with the purchase or sale of a security, (4) reliance, (5) economic loss, and (6) loss causation. *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 341-42 (2005).

Lentuo incorrectly asserts that the Section 10(b) claim should be dismissed because the Complaint does not sufficiently allege falsity, scienter, or loss causation.

### A. Applicable Legal Standards

On a motion to dismiss pursuant to Rule 12(b)(6), courts must accept the factual allegations as true and draw all reasonable inferences in Plaintiffs' favor. *See, e.g. Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007). Moreover, Plaintiffs need only "state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570; *accord Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1950 (2009) ("[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the conduct alleged."). Plaintiffs must only "nudge[] their claims across the line from conceivable to plausible. *Twombly*, 550 U.S. at 570. Plausible does not mean "probable;" rather, plausibility requires only that there be more than a "sheer possibility" that a defendant is liable for the alleged misconduct. *Iqbal*, 129 S.Ct. at 1949.

Moreover, "[A] district court ruling on a motion to dismiss is not sitting as a trier of fact. . . . [S]o long as the plaintiff alleges facts to support a theory that is not facially implausible, the court's skepticism is best reserved for the later stages of the proceedings when the plaintiff's case can be rejected on evidentiary grounds." *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1057 (9th Cir. 2008) *China Educ. Alliance Inc., Sec. Litig.*, 2011 WL 4978483 (C.D. Cal. Oct. 11, 2011).

Plaintiffs' MPA in Opposition to Defendant's Motion to Dismiss

Along with Rule 12(b)(6) requirements, a complaint alleging securities fraud must also satisfy the heightening pleading requirements of Rule 9(b) and the PSLRA. Fed. R. Civ. P. 9(b); 15 U.S.C. §§ 78u-4(b)(1)(B) and (b)(2)(A).  To adequately allege falsity under Federal Rule of Civil Procedure 9(b) and the PSLRA, a plaintiff must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which the belief is formed." *Middlesex Retirement System v. Quest Software, Inc.*, 2008 WL 7084629, at * 3 (C.D. Cal. July 10, 2008); 15 U.S.C. § 78u-4(b)(1).

A complaint alleging violations of Section 10(b) of the Exchange Act must state facts giving rise to a strong inference that the defendants made false or misleading statements either intentionally or with deliberate recklessness. *Zucco Partners, LLC*, 552 F.3d at 991. Deliberate recklessness is conduct that "reflects some degree of intentional or conscious misconduct." *South Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 782 (9th Cir. 2008). A complaint adequately pleads scienter if "a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.,* 127 S.Ct. 2499, 324 (2007).

In this Circuit, to plead loss causation, Plaintiffs need only plead a specific economic loss tied to a revelation that a particular misstatement is false. *Gilead*, 536 F.3d at 1056.

**B. Plaintiffs Adequately Pled Falsity**

**1. Plaintiffs Have Independently Verified the Existence of the Two Trusts**

Lentuo concedes the existence of the RMB 150 million loan, but contends that Plaintiffs failed to verify the existence of the RMB 100 million loan beyond what was stated in the GeoInvesting report.  Notwithstanding the fact that it *is* permissible to

Plaintiffs' MPA in Opposition to Defendant's Motion to Dismiss

rely on an analyst report for the purposes of a complaint, Plaintiffs have independently verified the existence of the RMB 100 million loan.

Indeed, prior to the filing of the initial complaint in this action on March 13, 2015 (Dkt. #1), Plaintiffs' counsel performed internet searches for the two loans. *See* Declaration of Jing Chen ("Chen Decl.") at ¶ 4. While the RMB 100 million dollar loan is indeed no longer available on Baidu Wenku, Plaintiffs' counsel found summaries of the loan as well as a full due diligence report of this loan on other PRC websites, corroborating the GeoInvesting Report. Chen Decl., Exs. 1 and 2. Lentuo's accusation is therefore false.

As for the RMB 150 million loan, Lentuo admits its existence, but attacks the "reliability" of GeoInvesting as well as the source of GeoInvesting's information, trust-trust.com, concerning the loan's terms and conditions. Lentuo's argument is not appropriate on a motion to dismiss. As an initial matter, Plaintiffs are not required to authenticate evidence on a complaint. *See, In re Cabletron Systems, Inc.,* 311 F.3d 11, 33 (1st Cir. 2002) ("As to this complaint, this court has said repeatedly that the rigorously standards for pleading securities fraud do not require a plaintiff to plead evidence.") *cited by Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 998, n.4 (9th Cir. 2009). Secondly, there are at least "[five] cases in the Central District arising out of alleged fraudulent schemes at Chinese companies similar to [Lentuo] where the courts have relied on independent analyst reports in evaluating a motion to dismiss because the reliability of such reports is a question of fact not appropriate for resolution on a Rule 12 motion." *Redwen v. Sino Clean Energy, Inc.*, 2012 WL 1991762, at *6 (C.D. Cal. June 4, 2012), *citing Scott v. ZST Digital Networks, Inc*., 2012 WL 538279, at *4 (C.D.Cal. Feb.14, 2012) (Feess, J.); *Dean v. China Agritech, Inc*., 2011 WL 5148598, at *3 (C.D.Cal. Oct.27, 2011) (Klausner, J.); *In re China Education Alliance, Inc*., 2011 WL 4978483, at *4–5 (C.D.Cal. Oct.11, 2011) (Snyder, J.); *Henning v. Orient Paper, Inc*., 2011 WL 2909322, at *4 (C.D.Cal. July 20, 2011) (Fairbank, J.). In questioning the accuracy of the "terms and conditions" of

the RMB 150 million loan, Lentuo is really attempting to contest GeoInvesting and trust-trust.com's *veractiy*.  But the truth of the facts in the GeoInvesting and trust-trust.com reports[3] are factual questions unsuitable for determination at the motion to dismiss stage. *Henning v. Orient Paper, Inc.,* 2011 WL 2909322, at *4 (C.D.Cal., July 20, 2011). As evidenced by the GeoInvesting Rebuttal, GeoInvesting stood by, and has continued to stand by, its statements.  The Court should not make a factual determination at this incipient stage of the litigation, but rather accept the truth of the facts alleged in the Complaint. *Twombly*, 550 U.S. at 572.

Additionally, Lentuo repeatedly attacks GeoInvesting as an "interested short seller," suggesting that it had incentive to make false and misleading statements about Lentuo.  The fact that GeoInvesting had a short position in the security and as Lentuo argues – a motive to cause Lentuou's stock to decline – does not impugn the credibility of the report.  *In re China Educ. Alliance, Inc. Sec. Litig.*, 2011 WL 4978483, at *4 (C.D. Cal. Oct. 11, 2011) (*Citing Henning*, 2011 WL 2909322 at *4; *In re LDK Solar Sees. Litig.*, 584 F.Supp.2d 1230, 1260 (N.D.Cal.2008).  The analyst's motives are not sufficient reason to determine a factual dispute as to the accuracy of the analyst report on a motion to dismiss.  And making false and misleading statements about a stock with the intent to profit from its fall is both a crime and a tort.  Indeed, in recent years, three short sellers have been sued for allegedly making false and misleading statements about U.S.-listed, PRC-based companies like Lentuo, each for damages in excess of $10 million.[4]  Barry Minkow has gone to prison and was ordered to pay restitution in excess of $500,000,000 for

---

[3] Trust-trust.com is an investment consulting website, owned and maintained by Honghai Wealth, a PRC-based wealth management company focusing on high net worth individuals. Chen Decl., at ¶8.

[4](*E.g. Deer Consumer Products, Inc. v. Alfred Little*, Index No. 650823/2011 (N.Y. Sup. Ct. 2011); *Sino-Clean Energy, Inc. v. Alfred Little*, Index No. 651248/2011 (N.Y. Sup. Ct.); *Skypeople Fruit Juice Inc. v. Absaroka Capital Management LLC*, 11-CV-239-NDF (D. Wy.))

Plaintiffs' MPA in Opposition to Defendant's Motion to Dismiss

publishing false and misleading statements about a company while holding a short position in its stock. (*U.S. v. Minkow*, 11-cr-20209-PAS, (S.D. Fla.)) (Dkt. #9, 33). If anything, GeoInvesting has every incentive to make sure every factual statement it makes is true to avoid crippling litigation or indictment. And, incidentally, Lentuo's argument proves far too much; Lentuo, like every issuer, has every incentive to raise the price of its stock, and its public statements should therefore be similarly discounted.

### 2. Lentuo's SEC Filings Were Misleading for Failure to Disclose the RMB 250 Million Trust Loans

Lentuo argues that its public filings were not false or misleading because LE is merely the parent company of Lentuo's VIEs, and therefore, is a separate entity. As such, Lentuo contends that concealing the RMB 250 Million Trust Loans from Lentuo's public filings did not render them misleading because Lentuo did not disclose anything about LE's debt one way or the other. This argument is unavailing and appears to take advantage of Lentuo and Guo's attempt to secretly raise money for the benefit of Lentuo by utilizing LE, a related party closely affiliated with Lentuo but not consolidated in its financial statements and that was 75% owned and controlled by Guo. Indeed, Lentuo's 2013 20-F explicitly identifies LE as a "related party." Declaration of Lisa Hathaway ("Hathaway Decl."), Ex. A at 101, F-47.

The trust documents for both loans show that the funds were really raised for the benefit of Lentuo and intended to be repaid by cash flow from Lentuo. For example, the trust document for the RMB 150 million loan indicates that the money raised would be for the purpose of constructing an Audi 4S store in Beijing. This matches the disclosure in Lentuo's 2013 20-F, in which Lentuo indicated that "we are also constructing a new Audi dealership in Beijing." This shows the purpose of the trust loans is to finance Lentuo's business operations, and Plaintiffs have pled so in the Complaint. *See, e.g.* ¶¶ 65-66, 70. Rather than disclose that the construction would be funded by its taking out a massive RMB 150 million trust loan, Lentuo

instead falsely stated that "As of December 31, 2013, the Group has contracted but unpaid cost of RMB 25,000 (US$4,130) for the construction of a new Audi store which is in progress."  ¶ 62.

Additionally, the trust documents reveal that the loans are to be repaid using cash flow from Lentuo's PRC operating entities.  The trust document for the RMB 150 million trust loan states that revenue generated from all 4S stores of LE would be used to pay back the loan; the 4S stores of LE are, of course, Lentuo's VIEs and Lentuo's sole source of revenue. ¶¶ 28, 31. The trust document for the RMB 100 million trust loan is even more explicit in referring to Lentuo as the source of repayment. In the "Risk Control" section, it specifically points to the fact that Lentuo went public on the NYSE in December 2010, persuading investors that there is a reliable and sufficient source of repayment.  The full due diligence report for the RMB 100 million trust loan not only details Lentuo's market capitalization and earnings per share, it even refers to Lentuo as a "subsidiary" of LE, and as such, included Lentuo's financials in LE's balance sheet. Chen Decl., Ex 2.  Yet, even though Lentuo held itself out to Chinese investors as a reliable source of repayment for the trust loans, and for all practical purposes, drew no distinction between it and LE (much less presenting it and LE as two completely separate and unrelated entities), it chose not to disclose the RMB 250 Million Trust Loans in its SEC filings and press releases to U.S. investors.  Instead, in its 2013 20-F and subsequent press releases announcing quarterly results, Lentuo misleadingly only disclosed one long-term loan, from the Shanghai Pudong Development Bank. ¶¶ 52, 54, 56.

### 3. Lentuo Had an Independent Duty to Disclose the Two Trusts Because of the Call Option Agreement Violation and Guo's Personal Guarantee

Lentuo had a duty to disclose the RMB 250 Million Trust Loans for two independent reasons: (1) the loans violated the Call Option Agreements, and (2) Guo personally guaranteed the two loans, putting at risk his entire 46% ownership interest in Lentuo and his 75% ownership interest in LE.

Plaintiffs' MPA in Opposition to Defendant's Motion to Dismiss

The Call Option Agreements entered into between Lentuo HK, LE, and each of Lentuo's VIEs explicitly prohibit, among other things, the VIEs from "incurring" or "guaranteeing" any liability.   Article 2.1.3 of the Call Option Agreement also expressly states that the VIEs "shall not sell, transfer, mortgage or dispose of any asset, business or beneficial right [of the VIE], or allow creation of any other Security Interest."   Lentuo argues that revenues of the 4S stores, i.e. Lentuo's VIEs, are merely "sources of money payback" and do not rise to the level of a security interest or collateral.   That is beside the point because the agreements specifically prohibit transferring or disposing of "any beneficial right" of the VIEs. Promising to allocate the VIE's revenue to the repayment of LE's RMB 250 million trust loans, rather than to Lentuo as required by the VIE agreements, is a breach of the Call Option Agreements and a material fact that must be disclosed and its omission renders all of the statements concerning Lentuo's VIE structure in its annual reports false and misleading. Moreover, whether "sources of money payback" constitutes collateral under Chinese law and business customs is a question of fact not suitable for determination at the pleading stage.   What is clear, however, is that the revenue of the 4S stores is at least a "beneficial right" of each of the 4S stores, and putting them up as "sources of money payback" clearly violates Article 2.1.3 prohibiting the disposition of beneficial rights of each of the VIEs.

Lentuo also needed to disclose the RMB 250 Million Trust Loans because Lentuo's founder and chairman Hetong Guo pledged unlimited joint and several liability guarantees for the loans.  This means that all of Guo's assets, including his 46% ownership interest in Lentuo and 75% interest in LE (and hence the VIEs), are part of the guarantee.  Indeed, the RMB 100 million loan specifically mentions Guo's ownership of 14,965,646 shares of Lentuo as a form of "Risk Control." ¶ 62. Investors in the trust, therefore, clearly views Guo's Lentuo shares as a form of collateral that they may be able to seize in case of default.  That a critical figure like Guo is jeopardizing his entire ownership interest in Lentuo is clearly a material fact

that shareholders need to know, as Lentuo's 20-F repeatedly mentions Guo's importance to the Company.

Indeed, Item 403 of Regulation S-K governing disclosures under the 1934 Securities Act required Lentuo to disclose Guo's pledges in Lentuo's annual reports filed with the SEC:

> *Security ownership of management.* Furnish the following information, as of the most recent practicable date, in substantially the tabular form indicated, as to each class of equity securities of the registrant or any of its parents or subsidiaries, including directors' qualifying shares, beneficially owned by all directors and nominees, naming them, each of the named executive officers as defined in Item 402(a)(3) (§ 229.402(a)(3)), and directors and executive officers of the registrant as a group, without naming them. Show in column (3) the total number of shares beneficially owned and in column (4) the percent of the class so owned. Of the number of shares shown in column (3), **indicate**, by footnote or otherwise, **the amount of shares that are pledged as security** and the amount of shares with respect to which such persons have the right to acquire beneficial ownership as specified in § 240.13d-3(d)(1) of this chapter.

| (1)<br>Title of class | (2)<br>Name of beneficial owner | (3)<br>Amount and nature of beneficial ownership | (4)<br>Percent of class |
|---|---|---|---|

17 C.F.R. § 299.403(b) (emphasis added).

In requiring public disclosure of pledged shares by executive officers and directors, the SEC has explained that "[t]o the extent that shares beneficially owned by named executive officers, directors and director nominees are used as collateral, these shares may be subject to material risk or contingencies that do not apply to other shares beneficially owned by these persons.  These circumstances have the potential to influence management's performance and decisions.  As a result, **we believe that the existence of these securities pledges could be material to shareholders**."  SEC Adopting Release 53197, Federal Register, Vol. 71, No. 174, September 8, 2006, Rules and Regulations.  (emphasis added). Violations of mandatory disclosure provisions are presumptively material.  *Steckman* v. *Hart*

*Brewing, Inc.*, 143 F.3d 1293, 1296 (9th Cir. 1999); *Craftmatic Sec. Litig.* v. *Kraftsow*, 890 F.2d 628, 641 n.17 (3d Cir. 1990); *see also* Victor Brudney, *A Note on Materiality and Soft Information Under the Federal Securities Laws*, 75 Va. L. Rev. 723, 727 (1989) (same).

### 4. Lentuo was Required to Disclose the RMB 250 Million Trust Loans as Related Party Transactions

Lentuo's 2013 20-F was also false and misleading for failure to disclose the RMB 250 Million Trust Loans as related party transactions. Plaintiffs allege that, while the loans were borrowed in LE's name, the proceeds were used to construct 4S shops for Lentuo. For example, per the trust document, the RMB 150 million dollar loan was earmarked for the construction of an Audi 4S shop in Beijing, matching Lentuo's disclosure in its 2013 20-F that it was constructing an Audi dealership in Beijing. ¶ 70. Moreover, Lentuo and Guo could not credibly argue that the RMB 100 million dollar loan, earmarked for the "construction and operation of 4S shops at Beijing Yayuncun and Changchun," were not for the benefit of Lentuo, as Lentuo's annual reports state the LE was no longer in the auto business, having transferred all of its auto dealership assets to the VIEs.[5] And if the new 4S shops at Yayuncun and Changchun were not intended to be part of Lentuo, then that means Guo was secretly funding LE's construction of shops that would compete with Lentuo's existing business, brazenly breaching his fiduciary duties to Lentuo, which would only further strengthen the already insurmountable evidence that Guo acted with scienter.

Indeed, because Lentuo was receiving the loan proceeds from LE, an admitted related party[6], to construct additional 4S shops for itself, Lentuo was required to disclose the transfer of funds from LE to Lentuo as a related party transaction. *See* U.S. Accounting Standards Codification ("ASC") 850-10-50-1 ("financial statements

---

[5] Hathaway Decl., Ex A at 6, Page 4 of 2013 20-F.
[6] Lentuo's 2013 20-F explicitly identifies LE as a "related party." Hathaway Decl., Ex. A at 101, F-47.

Plaintiffs' MPA in Opposition to Defendant's Motion to Dismiss

shall include disclosure of material related party transactions" including a description of the transaction and the dollar amount).  Similarly, the VIEs' obligation to use its revenue as the source to repay the RMB 250 million loans is a related party transaction that must be disclosed. Lentuo's violation of ASC 850-10-50-1 for failing to disclose these related party transactions renders its financial statements false and misleading. *See, e.g. City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Technology, Inc.,* 2013 WL 6441843, at *2 (N.D. Cal. Dec. 9, 2013) ("financial statements filed with the SEC which are not prepared in accordance with [Generally Accepted Accounting Principles] will be presumed to be misleading or inaccurate."). A number of courts in the Central District have held that failure to disclose related party transactions renders financial statements false and misleading. *Cheung v. Keyuan Petrochemicals, Inc.,* 2012 WL 5834894, at *8 (C.D. Cal. Nov. 1, 2012), *citing Brown v. China Integrated Energy, Inc.,* 875 F. Supp. 2d 1096, 1118-19 (C.D. Cal. 2012) (concluding that allegations that the defendant company failed to disclose transactions with entities owned by the defendant CEO's son from which the son received millions of dollars was adequate to plead falsity); *A–Power*, 2012 WL 1983341, at *8 (finding falsity adequately pleaded when the plaintiffs alleged that the defendants engaged in transactions with companies with which officers had direct ties and from which officers received financial incentives); *Snellink v. Gulf Res., Inc.*, 2012 WL 1693979, at *7 (C.D.Cal. May 15, 2012) (concluding that the failure to disclose related-party transactions adequately pleaded falsity).

### 5.  Lentuo Improperly Concealed Its Cash Flow Problems

Even though it was secretly raising RMB 250 million in 2013, and even though its 4S shops were in a state of "semi-closure" in early 2015 due to cash problems, Lentuo nevertheless asserts that it never concealed its cash flow problems.   This argument is entirely without merit.

Lentuo claims that its 2013 20-F actually disclosed negative cash flow.  This is misleading.  Lentuo seizes on a quote from page F-17 of its 2013 20-F, where Lentuo

states that it "had working capital deficiency of RMB228,979 (US$37,824) as of December 31, 2013 and had net cash used in operating activities of RMB228,017 (US$37,666) for the year then ended." Hathaway Decl., Ex. A at 63, F-17.  Right below that, however, Lentuo assures investors that: "The Company believes that the Group had unutilized bank facilities of RMB669,000 (US$110,509) as of December 31, 2013 would provide sufficient liquidity to finance the Company's anticipated working capital and capital expenditure requirements for the next twelve months." *Id.* Lentuo's brief omitted this part.  Hence even as late as May 2014,[7] five months after the RMB 250 Million Trust Loans were issued, Lentuo was still conveying to investors that it had sufficient cash to fund its operations. In truth, Lentuo had insufficient cash absent receipt of the proceeds of the RMB 250 Million Trust Loans.

Lentuo also argues that its statement: "We believe that our current cash and cash equivalents and cash flow from operations and financings will be sufficient to meet our expected cash requirements for working capital and certain capital expenditure purposes for the next 12 months." is a forward-looking statement protected by the PSLRA's "safe harbor" provision.  Lentuo is wrong because, even if assuming that it is a forward-looking statement, it receives no protection under the PSLRA because the Complaint pled that it was false at the time that it was made, and a statement made with actual knowledge that the statement was false or misleading does not fall under the protection of the PSLRA safe harbor.  15 U.S.C. § 77z–2(c)(1); *Yanek v. Staar Surgical Co.,* 388 F.Supp.2d 1110, 1130 (C.D. Cal. 2005). Indeed, Lentuo filed its 2013 20-F on May 15, 2014, approximately five months after it had to secretly raised RMB 250 million in China.  It therefore knew that its cash was not sufficient to fund its operations without the extra RMB 250 million.[8]

---

[7] Lentuo's 2013 Form 20-F was filed on May 15, 2014.

[8] Lentuo repeats this statement in the financial statements section of its 2013 20-F. *See* Hathaway Decl., Ex. A at 63, F-17.  Courts in this circuit have held that the PSLRA exempts forward-looking statements contained in financial statements. *See*

17

Lentuo also incorrectly argues that the BBT Article, which was published in March 2015 but described cash shortages that began earlier than that, reveals nothing about Lentuo's cash situation in May 2014.[9]  Plaintiffs' job at the pleading stage is to plead *plausible* theories of misconduct. "If there are two alternative explanations, one advanced by defendant and the other advanced by plaintiff, both of which are plausible, plaintiff's complaint survives a motion to dismiss."  *Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011).  Here, the BBT Article states that a responsible party at Lentuo's Mazda 4S shop told BBT that Lentuo has had problems "starting from [the end of 2014]."[10] ¶ 76.  The BBT Article further states that 4S dealerships in China have been facing an "unprecedented death trail" starting from 2013. ¶ 77.  From these details, it is certainly *plausible* that Lentuo's cash issues were present on May 15, 2014 when it filed its 20-F.  Additionally, allegations insufficient by themselves to

---

*e.g. In re Employees Solutions Sec. Litig.,* 1998 WL 1031506, at *4 (D. Ariz., Sept. 22, 1998).

[9] Lentuo frivolously disputes certain of Plaintiffs' translations of the BBT Article. For example, where Plaintiffs' translation said "a responsible person" at Lentuo's ChangAn Mazda 4S Shop, Lentuo translates it as a "person in charge", where Plaintiffs' translation said "a person associated with Lentuo," Lentuo offers "someone close to Lentuo."   Not only are these disputes immaterial, Lentuo is not permitted to offer competing translations on a motion to dismiss. *Altvater Gessler–J.A. Baczewski Int'l (USA) Inc. v. Sobieski Destylarnia S.A.*, 572 F.3d 86, 90 n. 5 (2d Cir.2009) (noting that where, at motion-to-dismiss stage, parties provided conflicting translations of contract, court must view the facts in the light most favorable to the non-moving party).

[10] Lentuo attempts to discredit the BBT Article by arguing that it is based on hearsay. But this is a motion to dismiss, not a motion for summary judgment.  Even if the BBT Article contains hearsay, Plaintiffs' complaint may still rely on it. *See, e.g. In re Air Disaster at Lockerbie, Scotland, on Dec. 21, 1988,* 144 F.R.D. 613, 617 (E.D.N.Y. 1992) (holding that complaints may be based on "hearsay reports and statements of others"*; In re Cabletron Systems, Inc.,* 311 F.3d 11, 33 (1st Cir. 2002) ("As to this complaint, this court has said repeatedly that the rigorously standards for pleading securities fraud do not require a plaintiff to plead evidence.") *cited by Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 998, n.4 (9th Cir. 2009).

Plaintiffs' MPA in Opposition to Defendant's Motion to Dismiss

1    "nudge" a right to relief over the line from conceivable to plausible may do so when

2    combined with other allegations. *Twombly*, 550 U.S. at 570.  Hence even assuming

3    *arguendo* the BBT Article is insufficient to plausibly establish that Lentuo's cash

4    problems were present in May 2014 or earlier (and it is sufficient), the Court should

5    also take into account the corroborating allegations that Lentuo had to secretly take

6    out RMB 250 million in loans in 2013 to continue funding its business operations.

7    **C. Plaintiffs Adequately Pled Scienter**

8        Plaintiffs allege that Lentuo and Guo secretly took out the RMB 250 Million

9    Trust Loans, and disguised it as unrelated to Lentuo by issuing the trusts through LE,

10   which is also controlled by Guo.  In determining whether "the pleaded facts give rise

11   to a 'strong' inference of scienter, the court must take into account plausible opposing

12   inferences." *Tellabs,* 551 U.S. at 323.  A court "must consider plausible, nonculpable

13   explanations for the defendant's conduct, as well as inferences favoring the plaintiff."

14   *Id.* at 324.  The inference that a defendant acted with scienter, however, need "not be

15   irrefutable" or "even the most plausible of competing inferences." *Id.* It need only be

16   "cogent and at least as compelling as any opposing inference one could draw from the

17   facts alleged." *Id.* Also, because a corporate defendant's scienter is necessarily

18   derived from its employees, Plaintiffs adequately plead scienter as to Lentuo if

19   Plaintiffs sufficiently allege scienter to at least one of the individual defendants in this

20   case, i.e. Guo, Yang, or Luo.  *See Nordstrom, Inc. v. Chubb & Son, Inc.,* 54 F.3d

21   1424, 1436 (9th Cir. 1995).  Plaintiffs have adequately pled scienter under this

22   standard.

23       Firstly, Guo knew about the RMB 250 Million Trust Loans because he agreed

24   to provide joint and several liability for them.  Moreover, as the Legal Representative

25   of LE and the VIEs, and the Authorized Representative of Lentuo HK, Guo signed

26   the Call Option Agreements on behalf of all three parties to the contract.  Guo's

27   concealment of Lentuo's receipt of the loan proceeds through LE and the VIEs'

28   obligation to repay the loans were also undisclosed related party transactions, which

courts have found sufficient to show scienter. *See Cheung v. Keyuan Petrochemicals, Inc.*, 2012 WL 5834894, at *9 (CEO knew "of the related party transactions and so he acted with scienter when he signed financial documents that failed to disclose those transactions."); *Brown,* 875 F. Supp. 2d at 1124 (That CEO omitted to disclose related party transactions with his son shows he was aware the financial statements were misleading.).Secondly, Guo and Lentuo had incentive to hide Lentuo's cash problems because Lentuo was still seeking to raise money as late as September 2014. Indeed, on September 9, 2014, Lentuo filed a Form F-3 with the SEC seeking to register $300 million worth of securities.  ¶ 86.  Defendants, therefore, had incentive to present Lentuo as financially-sound in order to attract investors in the U.S. *Nguyen v. Radient Pharm. Corp.*, 2011 WL 5041959, at *8 (C.D. Cal. Oct. 20, 2011) *citing Howard v. Everex Systems, Inc.* 228 F.3d 1057 (9th Cir.2000) (Defendants' "desire to raise company financing, combined with the 'red flags' of a company's financial condition, are sufficient to plead scienter.").  Guo was also motivated to conceal the transactions because he knew that the Call Option Agreements prohibited the VIEs from disposing of any beneficial rights that belonged to it, or securing any liabilities. Therefore, Guo knowingly violated the Call Option Agreements, which among other things, rendered false his Sarbanes-Oxley Certification filed in connection with the 2013 20-F.

Thirdly, Guo and Lentuo repeatedly denied, among other things: (1) that the RMB 100 million loan existed, (2) that Guo's entire assets were pledged, (3) that proceeds from the RMB 150 million loan were used for the benefit of Lentuo's operations, etc.  These false denials provide strong inference of scienter. *In re Turbodyne Technologies, Inc., Sec. Litig.,* 2000 WL 33961193, at *19 (C.D. Cal. Mar. 15, 2000) (holding that defendants' immediate denial of allegations contained in a research analyst's report constitutes circumstantial evidence sufficient to give rise a strong inference of scienter); *see also Rehm v. Eagle Financial Corp.,* 954 F.Supp. 1246, 1256 (N.D.Ill.1997) ("defendant's attempts to mollify public doubt about [the

corporation's] financial health by putting an optimistic and reassuring 'spin' on otherwise damaging [reports] show[ ] the defendants acted with knowledge"); *Carlson v. Xerox Corp*. 392 F.Supp.2d 267, 285 (D. Conn. 2005) (exculpatory statements, when shown to be false, are circumstantial evidence of guilty consciousness and have independent probative value of scienter); *United States v. DiStefano*, 555 F.2d 1094, 1104 (2d Cir.1977); *United States v. Johnson,* 513 F.2d 819, 824 (2d Cir.1975).  *S.E.C. v. Musella,* 748 F.Supp. 1028, 1040 (S.D.N.Y.1989).

Fourthly, that Lentuo's securities was halted and then delisted by the NYSE because of the Company ignored "repeated NYSE Regulation attempts at contact and requests for information" is also supportive of scienter.  If Lentuo did nothing wrong, why did it ignore the NYSE? Why didn't it respond to its regulator's request for information and cause itself to get delisted?

**D. Plaintiffs Adequately Pled Loss Causation**

The Ninth Circuit held in *In re Gilead Sciences Sec. Litig.,* 536 F.3d 1049, 1057-58 (9th Cir. 2008) that "so long as the complaint alleges facts that, if taken as true, plausibly establish loss causation, a Rule 12(b)(6) dismissal is inappropriate." The *Gilead* court explained that "this is not 'a probability requirement...it simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence' of loss causation." *Id.* (internal citation omitted).

Courts all over the country have agreed that it is generally inappropriate to rule on loss causation on a motion to dismiss.  For example, the Third Circuit in *McCabe v. Ernst & Young, LLP,* 494 F.3d 418, 427 n. 4 (3rd Cir.2007) stated that "loss causation becomes most critical at the proof stage," and cited scholarly authority stating that it is normally inappropriate to rule on loss causation at the pleading stage. (internal quotation marks omitted). Similarly, the Second Circuit has held that loss causation "is a matter of proof at trial and not to be decided on a Rule 12(b)(6) motion to dismiss." *Emergent Capital Inv. Mgmt., LLC. v. Stonepath Group, Inc.*, 343 F.3d 189, 197 (2d Cir.2003).

Plaintiffs plead two partial corrective disclosures that revealed Lentuo's faltering business and severe cash shortages: the GeoInvesting Rebuttal and the BBT Article.  Lentuo's claim that neither the GeoInvesting Rebuttal nor the BBT Article disclosed actual fraudulent practices or posited any theory of fraud is both factually and legally wrong.  The BBT Article revealed, among other things, that Lentuo was having cash problems, and that Lentuo's show cars had their keys taken away by banks due to Lentuo's cash problems, and that Lentuo's 4S shops have essentially stopped selling new cars.[11]  Lentuo never previously disclosed any of this to the public.  The fraud is clear: Lentuo knowingly concealed its severe cash problems. Likewise, the GeoInvesting Rebuttal made clear that Lentuo secretly borrowed RMB 250 million through two trust loans and secured it with revenues from Lentuo's 4S shops and Hetong Guo's assets.   The fraud is again clear: Lentuo knowingly concealed that it needed to, and did, take out the RMB 250 Million Trust loans in order to fund its operations.

Lentuo appears to be arguing that a corrective disclosure needs to explicitly spell out the exact mechanisms of the fraud.  If so, then Lentuo is seriously mistaken. In a line of cases starting with *In re Daou Systems, Inc. Sec. Litig.,* 411 F.3d 1006 (9th Cir. 2004), the Ninth Circuit held that it is sufficient for a corrective disclosure to reveal a company's true financial condition, rather than expressly expose any actual fraud.   In *Daou,* the company improperly recognized revenue before they were earned, and Daou's stock plummeted once the true revenue figures were revealed. Even though the corrective disclosure merely revealed Daou's true financial condition, rather than explicitly identify a fraud, the Court held that loss causation had been adequately pled because "Plaintiffs allege that these disclosures of Daou's true financial health, the result of prematurely recognizing revenue before it was

---

[11]   It is impossible to sell a new car when a customer is unable to open the door and sit inside or even take the car for a test-drive.

Plaintiffs' MPA in Opposition to Defendant's Motion to Dismiss

1   earned, led to a 'dramatic, negative effect on the market, causing Daou's stock to

2   decline[.]" *Id.* at 1026.

3        The *Daou* line of reasoning was following in a recent Ninth Circuit decision,

4   *Nuveen Municipal High Income Opportunity Fund v. City of Almeda,* 730 F.3d 1111

5   (9th Cir. 2013).  The *Nuveen* court held that "disclosure of a fraud is not a *sine qua*

6   *non* of loss causation, which may be shown even where the alleged fraud is not

7   necessarily revealed prior to the economic loss."  *Id.* at 1120.  Rather, "a plaintiff can

8   satisfy loss causation by showing that 'the defendant misrepresented or omitted the

9   very facts that were a substantial factor in causing the plaintiff's economic loss." *Id.*

10  (internal citation omitted).  Plaintiffs have done so, by alleging in detail Lentuo's

11  stock drops following the publication of the BBT Article and the GeoInvesting

12  Rebuttal.

13       Lentuo's citations to *Oregon Public Employees Retirement Fund v. Apollo*

14  *Group, Inc.,* 774 F.3d 598 (9th Cir. 2014) and *Metzler Inv. GMBH v. Corintian*

15  *Colls., Inc.,* 540 F.3d 1049 (9th Cir. 2008) are misplaced.  In *Apollo,* the plaintiffs

16  there failed to allege any statements made by the defendants that were later shown to

17  be untrue or called into question by subsequent disclosures.  Here, Plaintiffs have

18  alleged a plethora of false and misleading statements and omissions that came to light

19  due to the corrective disclosures.  In *Metzler,* the alleged corrective disclosures

20  actually do not speak to any fraud at all, but only revealed a "potential" for fraudulent

21  conduct.  *Id.* at 1065.  Here, the partial corrective disclosures assert more than just the

22  "potential" for fraudulent conduct.  The corrective disclosures revealed, among other

23  things, that Lentuo *had secretly taken* out RMB 250 million in loans, Guo's assets

24  *had been* pledged, Lentuo's show car keys *had been* confiscated, and that none of this

25  *was ever* disclosed.  Indeed, the facts disclosed here were not mere hypotheticals or

26  potentials, but rather, hard facts that have already transpired and from which investors

27  are able to clearly deduce that they have been misled.

28

23

Plaintiffs' MPA in Opposition to Defendant's Motion to Dismiss

1    Lentuo also argues that the June 5, 2014 GeoInvesting Rebuttal cannot

2 constitute a corrective disclosure because the information contained therein was

3 already revealed by the May 28, 2014 GeoInvesting Report, and no stock drop

4 occurred immediately following the May 28th GeoInvesting Report.  Critical to the

5 analysis here is that the *very next morning*, on May 29th, Lentuo issued its response to

6 the GeoInvesting Report, refuting GeoInvesting's allegations.   Hence before the

7 market could digest the May 28th GeoInvesting Report, Lentuo's false denial was

8 already disseminated, buoying Lentuo's stock price.  Hence it was not until the June

9 5th GeoInvesting Rebuttal debunking Lentuo's response that Lentuo's stock price

10 reacted to the disclosures.   Indeed, in discussing loss causation, the Ninth Circuit

11 stated that: "We reject[] "a bright-line rule requiring an immediate market reaction"

12 because "the market is subject to distortions that prevent the ideal of a free and open

13 public market from occurring." *Gilead,* at 1057-58.  Indeed, Lentuo has not identified

14 any other news on June 5th that could have caused Lentuo's precipitous stock drop.

15 From this inquiry, a plausible inference is that it was the GeoInvesting Rebuttal that

16 caused Lentuo's stock to drop on June 5th, and a plausible inference is all that

17 Plaintiffs need at the pleading stage. *Id.*

18    Indeed, *Gilead* is instructive and bears resemblance to the facts here.   In

19 *Gilead,* the company was engaging in off-label marketing for its drug Viread, in

20 contravention of the FDA's marketing regulations.   *Id.* at 1050-51. As a result of

21 Gilead's highly successful but illegal off-label marketing, 75 to 95% of Viread sales

22 resulted from Gilead's off-label marketing efforts.   *Id.* at 1051. On August 7, 2003,

23 however, the FDA made public a Warning Letter that it issued to Gilead, chastising

24 Gilead for its illegal marketing and ordering it to make corrective disclosures.   *Id.* at

25 1053.  The Warning Letter failed to negatively impact Gilead's stock price, however,

26 as shareholders did not appreciate the extent of Gilead's off-label marketing and thus

27 could not anticipate the Warning Letter's impact on Viread's sales.   *Id.* It was not

28 until October 28, 2003 when Gilead announced its third quarter financial results,

Plaintiffs' MPA in Opposition to Defendant's Motion to Dismiss

showing drastically reduced sales for Viread, that Gilead's stock price plummeted. *Id.* at 1054. In other words, the stock drop did not occur until almost three months after the corrective disclosure, because it was not until October 28, 2013 that the public realized the full impact of the FDA Warning Letter.  Here, the initial GeoInvesting Report was followed by vociferous denial by Lentuo. The GeoInvesting Rebuttal was more convincing and caused a relatively small 9% drop in Lentuo's stock value because the public did not fully appreciate the full extent of Lentuo's financial woes, and it was not until the BBT Article that the public realized the full story – that Lentuo was experiencing crippling cash shortage that was essentially forcing it to shut down.  Thus, following the BBT Article, Lentuo stock dropped a staggering 50%. ¶80.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court deny Lentuo's motion to dismiss in its entirety.

Dated: November 5, 2015                 Respectfully submitted,

**THE ROSEN LAW FIRM, P.A.**
*/s/ Laurence Rosen*
Laurence M. Rosen, Esq. (SBN 219683)
355 S. Grand Avenue, Suite 2450
Los Angeles, CA 90071
Telephone: (213) 785-2610
Facsimile: (213) 226-4684
Email: lrosen@rosenlegal.com

Yu Shi, Esq. (*Pro Hac Vice*)
275 Madison Ave, 34th Floor
New York, NY 10016
Telephone: (212) 686-1060
Facsimile: (212) 202-3827
Email: yshi@rosenlegal.com

Counsel for Lead Plaintiffs

25

## Attachment 1: Lentuo's Corporate Structure



Plaintiffs' MPA in Opposition to Defendant's Motion to Dismiss

## **CERTIFICATE OF SERVICE**

I, Laurence Rosen, hereby declare under penalty of perjury as follows:

I am attorney with the Rosen Law Firm, P.A., with offices at 355 South Grand Avenue, Suite 2450, Los Angeles, CA, 90071. I am over the age of eighteen.

On November 5, 2015, I electronically filed the foregoing PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANT LENTUO INTERNATIONAL INC.'S MOTION TO DISMISS AMENDED CLASS ACTION COMPLAINT  with the Clerk of the Court using the CM/ECF system, which sent notification of such filing to counsel of record.

Executed on November 5, 2015

/s/ Laurence Rosen
Laurence Rosen

Plaintiffs' MPA in Opposition to Defendant's Motion to Dismiss